McKINNEY ICE, LIGHT & COAL CO. et al. v. MONTGOMERY. (No. 7248.)

(Court of Civil Appeals of Texas. Dallas. April 24, 1915. Rehearing Denied May 22, 1915.)

1. TRIAL ☞260—REQUESTED INSTRUCTIONS—GIVEN INSTRUCTIONS.

In an action against a light company and a city for injury to plaintiff while turning off a light in his residence, the refusal of the company's requested charges, presenting in various forms the proposition that if the city's arc wire came in contact with the limbs of a tree, and such contact caused the arc wire to burn apart, or if a bracket attached to the tree broke, so that the city wire fell upon the light company's service wires and transmitted to them an excessive voltage, which entered plaintiff's residence and caused his injury, and that the city's maintenance of its wire in the tree was the proximate cause of injury, the company was not liable, was properly refused, where the general charge grouped all the facts which would constitute sole liability of the city, and directed that if the city's wire was permitted to come in contact with the limbs of the tree, and by reason thereof broke, and came in contact with the company's wires, giving them a heavy volt-

age, which was conveyed on plaintiff's wire and caused the injury, the city was liable, as such charge affirmatively submitted the matter of the requested charges.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 651–659; Dec. Dig. ☞260.]

2. APPEAL AND ERROR ☞1067 — HARMLESS ERROR—INSTRUCTIONS.

In such case, error, if any, in the refusal, was not such a denial of the rights of the defendant light company as was calculated to cause and probably did cause the rendition of an improper judgment, and hence was harmless.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4229; Dec. Dig. ☞1067.]

3. ELECTRICITY ☞19—NEGLIGENCE.

In an action against a light company and a city for personal injury from an electric current, the light company's requested charge that if the city maintained arc wires in a tree near where the wires crossed, and the city's wires were burned or broken apart by contact with the limbs of the tree, and came into contact with the company's service wires, charging them with an excessive voltage, which injured plaintiff, and that, if the city's maintenance of such wires in the tree was the proximate cause of injury, the light company was not liable, was properly refused as a definition of active negligence, since the passive omission to do a thing may be as great negligence as active negligence.

[Ed. Note.—For other cases, see Electricity, Cent. Dig. § 11; Dec. Dig. ☞19.]

4. TRIAL ☞260—REQUESTED INSTRUCTIONS—GIVEN INSTRUCTIONS.

Such charge was properly refused, where the negligence of the light company as disclosed by the evidence was fully submitted to the jury in the general charge, stating what would make the city solely liable.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 651–659; Dec. Dig. ☞260.]

5. APPEAL AND ERROR ☞1067 — HARMLESS ERROR—FAILURE TO INSTRUCT.

In such action, the failure to instruct to find for defendant company, if the' wires in plaintiff's residence were defective and caused his injury, was harmless, where the record did not contain evidence of sufficient probative force to have sustained a finding in that respect.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4229; Dec. Dig. ☞1067.]

6. TRIAL ☞260—REQUESTED INSTRUCTION—GIVEN INSTRUCTION.

In such action, the refusal to give the light company's requested charge on the issue of unavoidable accident was proper, where the court charged to find for both defendants, if plaintiff's injuries resulted from an accident and, in its general charge, included all the facts which, under the evidence, would relieve the company from liability, and instructed the jury on finding its nonliability to find solely against the city, since to charge that neither of the defendants would be liable for an accident was equivalent to charging that the company alone would not be liable.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 651–659; Dec. Dig. ☞260.]

7. DAMAGES ☞132 — EXCESSIVE DAMAGES — PERSONAL INJURIES.

A verdict of $2,250 to plaintiff, who was burned by an electric current over a large space on the thigh, in places nearly to the bone, whose forefinger and the palm of whose right hand and the tips of the fingers of the left hand were severely burned, who was confined to his bed three weeks, to his room seven weeks, and whose wounds did not heal until eleven weeks, leaving the forefinger numb, so as to affect his writing, and the burned thigh and hand weaker

than before the injury, resulting in nervousness, poorer appetite, and more broken sleep, and who endured severe suffering at the time of the accident, although he continued to hold his same position at the same salary, was not excessive.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 372–385, 396; Dec. Dig. ⊕⟶132.]

8. APPEAL AND ERROR ⊕⟶1175 — REVIEW — VERDICT.

Where the evidence, in an action against a city for personal injury from an electric current, at most raised a mere surmise or suspicion that the city current was turned onto its wires at the time of the injury, the jury was not authorized to infer that the current was on its wires, a fact necessary to establish its negligence, and the appellate court, required "to render such judgment or decree as the court below should have rendered," would reverse a verdict for plaintiff and render judgment for the city.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4573–4587; Dec. Dig. ⊕⟶ 1175.]

Appeal from District Court, Collin County; W. J. Mathis, Judge.

Action by J. H. Montgomery against the McKinney Ice, Light & Coal Company and the City of McKinney, with cross-bills by defendants against each other. Judgment for plaintiff against defendants, and against each defendant on its cross-bill, and defendants appeal. Affirmed as to defendant McKinney Ice, Light & Coal Company, and reversed as to defendant City of McKinney, and judgment rendered for such defendant.

F. E. Wilcox, Jewell Abernathy, R. C. Merritt, and W. R. Abernathy, all of McKinney, for appellants. Wallace Hughston and G. R. Smith, both of McKinney, for appellee.

RASBURY, J. The appellee on September 12, 1912, while in the act of turning off the electric current from a light in his bathroom, was seriously burned and shocked as the result of a heavy charge of electricity passing into his body. The light was what is termed a droplight, and consisted of a brass-receiving socket and globe attached to an insulated cord suspended from the ceiling. When appellee seized the light to turn it off, the current was so great he was unable to release it. In his struggles his thigh came in contact with a lavatory in the bathroom, which appears to have increased the current, for, in addition to burning his thigh seriously, he soon lost consciousness and fell to the floor. Appellee thereafter sued appellants, the McKinney Ice, Light & Coal Company and the city of McKinney, hereafter designated, respectively, as light company and city, both at the time appellee was injured maintaining and operating an electric light plant in McKinney, the former company furnishing all character of electric service to those that wanted it, likewise the latter, which in addition lighted its streets. Appellee alleged that he was injured as the result of the negligence of both appellants. Each appellant denied negligence and filed cross-bills against the oth-

er, urging, in effect, that, if appellee was injured, it was due to the sole negligence of its codefendant, against which contribution was sought. There was a jury trial resulting in verdict for appellee for $2,250 against appellants jointly, and a verdict finding against both appellants on their respective cross-bills. Judgment followed the verdict. Both appellants have appealed from the judgment in favor of appellee and from the judgment decreeing them jointly liable.

The pleadings of the parties properly raise all issues presented in the respective briefs, and for that reason we omit a detailed statement thereof. Nor will we attempt to collate the facts deducible from the evidence of the several parties, but content ourselves in that respect by reference thereto when considering the issues demanding it. It is necessary, however, in order to intelligently view the appeal, to say, in addition to what we have related above, that Tucker street in McKinney ranges east and west. The city has its poles and arc wires on the north side of Tucker street, and the light company has its poles and wires on the south side thereof. At a point on Tucker street, near where Hunt street, a north and south street, intersects said Tucker street, a service wire belonging to the light company extends from the south side of Tucker street across to the residence of H. Q. Smith, a customer on the north side. The lines of the light company at the intersection of Tucker and Hunt streets cross Hunt street, and then turn south on the east side thereof and enter the house a block or more away, where appellee was injured. The evidence was conflicting as to whether the arc wires were above the service wires or the service wires above the arc wires at the point where the wires of appellants crossed. When appellee received his injuries, in the manner we have stated, it was after night had fallen, and several theories were advanced in explanation of his injuries on trial, and it is urged on appeal that the evidence will sustain the verdict of the jury that the appellants were jointly negligent, or that the evidence will sustain the verdict against one of the appellants. Appellant city contends, however, that under the evidence no liability against it is shown at all, but of this feature of the case more anon.

[1, 2] It is first urged by the light company, the brief of which will be first considered, in effect, that the court erred in refusing to give its specially requested charges B and 3. These charges were separately requested, and the asserted error in refusing to allow them are presented in separate assignments, but, since they present the same question in a different form, they will be considered together. The effect of the requested charges was to tell the jury that if they should conclude from the evidence that, at the time appellee was injured, the arc wires of the city

came in contact with the limb or limbs of a tree, through which the evidence showed it passed, and that such contact caused the said arc wires to burn apart, or to break apart and fall upon the service wires of the light company and transmit to same an excessive voltage of electricity, which in turn entered the wires in the residence of appellee and caused his injuries, etc., and that so maintaining its wires in said tree was the sole proximate cause of appellee's injuries, to return a verdict for said light company. The proposition asserted in connection with the refused charges is that the pleading and evidence raised the issue presented by the special charges, and hence appellant light company was entitled to have the issue presented affirmatively. The proposition, assuming for the discussion that the evidence raised the issue, is theoretically correct; but we conclude nevertheless that the court properly refused both charges, since the court told the jury substantially as much in the ninth paragraph of the general charge. St. Louis S. F. & T. Ry. Co. v. Overturf, 163 S. W. 639, and cases cited. In the case cited it was said:

"It has been repeatedly held and is now settled law that the defendant is entitled to have presented to the jury any specified group of facts developed upon trial, which, if true, would in law establish a given defense, provided, of course, that such requested charge is not substantially covered by the main charge or other allowed special charges."

The ninth paragraph of the court's general charge groups all the facts which would constitute sole liability on the part of appellant city, and directs the jury, among other matters, that:

"If you believe from the evidence that the wire of defendant city of McKinney was permitted to come in contact with one of the limbs of a tree then and there situate, and * * * that by reason of said wire coming in contact with said limb the wire in question melted or broke, and * * * was thereby caused to fall upon or come in contact with the wires of defendant McKinney Ice, Light & Coal Company, and * * * a heavy voltage of electric current was thereby conveyed into plaintiff's bathroom," etc., and "injured appellee as claimed, then, * * * if you so believe, you will find for plaintiff against the defendant city of McKinney, and assess his damages as hereinafter set forth."

This portion of the court's charge, it will be seen, groups the identical facts enumerated by appellant light company in the requested charges, and tells the jury affirmatively, if they believe the recited facts to be true, to return verdict solely against appellant city of McKinney. Argument or illustration is not required to demonstrate that the facts set out in the requested charges were fairly grouped in the general charge. Then were they affirmatively presented? Clearly so, we believe, since the jury were told, if they believed the facts so grouped to be true, to find solely against appellant the city of McKinney. True, the charge did not say, as it might properly have done, and in favor of the appellant the light company.

176 S.W.—49⁵

But no other result could have followed had the jury adopted the theory of the case thus presented. The purpose of the rule invoked by the special charges is to have the jury consider the very facts constituting the defense urged, and to have the jury instructed, if they believe such facts to be true, to find for the party urging them, and it is not material how or in what part of the court's charge the instruction is given. Ordinarily in cases where there is but a single defendant or more than one, but no cross-action as between the defendants, it would be correct to instruct the jury to find for the defendant, if the facts were believed to be true. But in a case like the instant one, where each defendant is by cross-action seeking relief against its codefendant, and the trial court assumes the evidence raises that issue, and so submits the case, it is proper to tell the jury that the conditions under such group of facts would constitute sole liability against the other defendant. Finally it may be said that the error complained of, if error, did not amount to such a denial of the rights of appellant light company as was calculated to cause and probably did cause the rendition of an improper judgment, and that therefore it was harmless.

It is also urged that the court erred in refusing to read to the jury appellant light company's special charge No. 6, which told the jury if the wire of the appellant city of McKinney was caused to fall upon the wire of its codefendant, the light company, by reason of one of its brackets attached to a tree becoming unfastened, and that fact was the cause of appellee's injuries, to find for appellant light company. This issue was also presented to the jury in the ninth paragraph of the court's charge in the same manner in which the issues just discussed were presented, and what we have said there applies to the issue so raised.

It is next urged that the court erred in refusing appellant light company's specially requested charge No. 4, directing the jury in effect to find in its favor if they believed the city maintained its arc wires in a tree adjacent to where the wires of appellants crossed, and that the wires of the city were burned or broken apart by coming in contact with the limbs of said tree and fell upon the wires of appellant light company, imparting to them an excessive charge of electricity, in turn injuring appellee, and that the maintaining of said wire in said tree was the primary, active, continuing, producing, and proximate cause of appellee's injuries. The proposition contended for under the quoted charge is that the appellant was entitled to have such facts grouped and affirmatively presented to the jury for their consideration. The facts detailed in the requested charge are the same facts grouped in the other special charges, which we have discussed, and, as indicated, in discussing them they were sufficiently grouped

and presented in the ninth paragraph of the court's main charge.

[3] The charge, however, is also submitted as a proposition, and the authorities cited thereunder indicate that the charge was submitted to the court as correctly defining active negligence. If so, we think it was properly refused on that ground. If the term "active and passive negligence," has any place in our jurisprudence, the mere words themselves are without force, in the absence of any definition of the meaning or import given them by law, since passively omitting to do a thing might conceivably instance as great negligence as would the active commission of some act of negligence.

[4] Further, the active negligence of the appellant, as disclosed by the evidence, was fully submitted to the jury by the ninth paragraph of the court's charge, wherein is submitted those facts which the jury is told will make appellant city of McKinney solely liable, if believed by the jury. The jury was not told that those acts were acts constituting active negligence, but were told that they would fasten sole liability upon the city, if believed. The facts, however, did, as between the appellants, constitute active negligence on the part of the city, and in our opinion is all that appellant light company was entitled to under the rule invoked. A similar charge relating to the bracket in the tree becoming unfastened and precipitating the city's wires upon the company's wires was also requested and refused and is presented on this appeal. But, for the reasons just stated, there was, in our opinion, no error in that respect.

[5] It is next contended that the court erred in not instructing the jury in effect that if the wires, light fixtures, or appliances in appellee's residence were deficient or out of repair or improperly installed or constructed, and thereby caused appellee's injuries, to find for appellant light company. The light company did not raise by its pleading the issue which it claims should have been submitted. It did, however, adopt the pleading of the city tendering that issue. The court did refuse to submit the issue, except on behalf of the appellant city. We conclude the action of the court was harmless, since the record, in our opinion, fails to disclose any evidence of sufficient probative force to have sustained a finding in that respect.

[6] It is next urged that the trial court erred in refusing to allow appellant light company's special charge submitting the issue of unavoidable accident. On this question the court told the jury if "plaintiff's injuries resulted from what is known as an accident (that is, if plaintiff was injured), but neither of said defendants was guilty of negligence," to find for both defendants. The point made is that the court did not submit the issue as to appellant company alone and

singly, but erroneously coupled it with its codefendant. In the ninth paragraph of the court's charge, as stated in several places in this opinion, all the facts, which, under the evidence, would relieve appellant light company from liability, were presented, and the jury told, if they believed them true, to find solely against the city. These facts are the only facts upon which the issue of accident could be based, and, in our opinion, they do not raise the issue of accident. But, if accident was raised by the evidence, the charge is sufficient, since it tells the jury that neither of the defendants would be liable in that event. To say that neither of two defendants are liable if the plaintiff was injured accidentally is to say that they are not liable, no matter how the accident occurred. Accident is the issue, not the number of defendants to be released if the cause was accidental.

[7] It is next urged that the verdict is excessive in amount. Appellee was burned on the thigh over a space eight to ten inches long, by four or five inches wide. The burn in part was nearly to the bone. Every finger, particularly the forefinger, and the palm of his right hand, was severely burned; the flesh adhering to the globe when he fell unconscious. The tips of the fingers of the left hand were also burned. He was confined to his bed three weeks, his room seven weeks, and it was eleven weeks before his wounds healed. The extent of his permanent injuries is that the forefinger of the right hand is dead or numb and stiff. Such condition affects his writing materially. The burned leg is weaker since its injury, as is also the burned hand. He is nervous since his injury, his appetite is not as good as formerly, and he sleeps indifferently at times. The physical pain and mental anguish which he suffered at the time of the accident and before the lapse of consciousness were, as appellee puts it, nearly "unbearably severe." After the injuries he suffered great physical pain for a period of three weeks. He has the same position he held before his injuries, and is commanding the same salary, and is doing the same work, except in reference to bookkeeping, which he is unable now to do. In matters affecting the amount of the verdict, we have but slight discretion, and, in the absence of any showing that the jury was moved either by passion or prejudice, we are unable to say that the facts detailed do not support the verdict of $2,250. It is our opinion that they do support it.

So far we have discussed only the errors assigned by the light company, and, as indicated by the views here expressed thereon, we have concluded that, so far as relates to the light company, none of the assignments present reversible error.

The first assignment of error presented by the appellant city of McKinney is that as to

it the verdict and judgment are not supported by the evidence, since it is practically undisputed that, at the time appellee was injured, the wires of the city of McKinney were not charged, or that the current of electricity was not on. In support of the issue thus raised, appellant city of McKinney assembles under its said assignment what purports to be all the material evidence on the question of whether the current was on the city's wires at the time appellee was injured. The evidence so assembled is not challenged in any respect either by appellee or appellant light company, and we assume it is correctly quoted and constitutes all the material evidence on the point. It is as follows:

L. F. Chelf testified:

That he was in the employ of the city during the fall of 1912 as engineer. That he remembered the fire at Mr. Hynds' or up in there somewhere. That the arc lights of the city were not on that night. That he had not put them on. That he did not know where Mr. McKennon was that night when he phoned and told him if he had put on the arc lights to pull them off. That they were not on then. That he did not know where he phoned him from, and did not know what night nor where the fire was, and did not know what month. "I just know that some time or other he phoned me not to put light on, and I hadn't put lights on. I did not hear the next day where the fire was, but next night when I went back on duty I phoned and asked him. I do not remember any other occasion when Mr. McKennon phoned me with reference to lights. That is the only occasion. It is not a fact that whenever there is a fire they frequently phone me to shut the light off. They never did it before. That is the only time. We never shut lights off during a fire."

W. E. McKennon testified substantially as follows:

"I am the superintendent of the water and light department of the city. I remember the occasion along about September, 1912, when the fire alarm was given at Mr. Hynds' house and the fire department was there. I was with them. In going up there we passed two of the arc lights of the city, and those lights were not burning. The night that the fire department and I went to Mr. Hynds', I communicated with Mr. Chelf at the light plant by telephone. I telephoned from Mr. Hynds', and that is the same night that Mr. Montgomery is said to have been hurt."

J. S. McKinney testified as follows:

"My name is J. S. McKinney. I am city marshal of the city of McKinney, and I have lived here a long time. I went to the fire that night at Mr. Hynds', and it was 7:30 and dark at that time. In going up to Mr. Hynds' we passed by two or three of the arc lights of the city of McKinney, and they were not burning. Those lights were not on when we passed. I said that, when I went up there to the fire on the fire wagon, the lights were not on, but I really could not tell the jury whether or not they had been on. I belong to the fire department. I do not remember to have seen any street lights on before I started to the fire."

Tom Chambliss testified as follows:

"I live at McKinney, and am working for the city, and have been for three years. I remember the occasion when the fire alarm was turned in from Mr. Hynds' house along about September, 1912, and I went to it. I went to the fire on the wagon and drove the wagon. Our

fire station is about the middle of the block south from southwest corner of the square. When the firm alarm was turned, I drove No. 2, the big wagon. We passed through town on our way to Mr. Hynds', and we passed by a number of arc lights, and none of them were burning. I do not know whether they had been burning or not, but I had not seen them on."

Tom Wallace testified as follows:

"I live here in McKinney and have lived here about all my life. I am a member of the McKinney Volunteer Fire Department. It is not a paid department. I remember the occasion of the fire at Mr. Hynds' in September, 1912. I answered the call that night. I went to the fire on wagon No. 2. I think we went right up this street where the street car line goes up, and then turned there on Church street, and then made a turn on Hunt street, and then turned up there by the high school building, and then turned on Tucker street. I don't think the arc lights were burning as we went to the fire."

S. O. Scott, a witness for defendant McKinney Ice, Light & Coal Company, testified as follows:

"I remember the occasion of the fire at Mr. Hynds' house, and the occasion that Mr. Montgomery claimed to have received the shock. At the time of that fire, and on that occasion, the arc lights of the city of McKinney were not burning when the fire alarm was given, but they were burning just prior to the fire, and at the time of the fire they were not burning."

On cross-examination he testified:

"That night, just before the fire alarm, I was on the street between the Episcopal parsonage and where Mr. Shirley lives. It was just after sundown or about sundown (I don't know the exact time of day), or was beginning to get a little dark. I do not know that it was later than that, and I do not know just how late it was, but, to the best of my remembrance, it was beginning to get about twilight. Those lights burned a very short time; they came on, and I was walking along there, and the lights came on. The light that I saw was the one by the Episcopal Church—the arc light right there in front of my house. I suppose the light was on half a minute or something like it. It just came on and flickered a little bit and then went out. It just burned from a half minute to a minute. It just burned a little bit, and I noticed it flickering, and then it went out. I saw the spark come on a minute. As to whether or not that flash was made when those lines came in contact up there in the street I will say I don't know anything about that. I am not aiming to swear that the engineer down at the power plant turned on the lights that night. I don't know anything about that."

L. M. Taylor, a witness for the city, testified as follows:

"I live at Dallas, and have been living there off and on for 18 years. I am city electrician at Dallas, and have charge of the wiring inside and overhead construction. I have had 15 years' experience in building plants, making estimates, and doing the different classes of engineering work. A wire that has no current on it is what we call a dead wire. If the lights had not been turned on the city arc line, and the house wire fell over and came across the dead arc wire, and the house wire became grounded across the arc wire, that would put some current of electricity on there; and, while it is putting on that current of electricity, it may arc or flash, and it may burn the arc and flash, but it is an unknown quantity. It might make the arc light and flash and burn a while, but we cannot tell how much current we are getting. I understand that this was a house wire, but the primaries as a rule have 2,300

(volts) on, and they reduce it to 110, but that side of the house (wire) coming across, and the other side being grounded, you could have gotten 2,300 (volts) through that line. It would create a sparking or arcing where it would come in contact, but I don't think it would go a foot high. The reflection may look like it is a foot high, but I don't think it would be an arc a foot high."

This witness further testified that if the house wire fell across an arc wire which had no current, and became grounded, this would burn the arc wire in two. On cross-examination he testified:

"I told Judge Wilcox that, if the arc wire broke in two, when it broke in two the lights went out. If both ends fell down to the earth, and both grounded, the arc would come up to candle power and burn just the same as if nothing had happened. When I told him that arc light went out, I meant absolutely at that time, at that second, the current was off. As soon as those ends dropped to the ground and made a ground, no matter if they were 5, 10, or 20 feet apart, just as soon as both the ends reached the ground the arc would go up."

It was further shown by the testimony of W. E. McKennon, the superintendent of the city light department: That, in coming back from Mr. Hynds' the night in question, he came by H. Q. Smith's residence, and one of Mr. Smith's feed wires was down in the street sparking, and that Tennie McCowan tied one end of it up around Mr. Smith's porch column. That he saw the arc wire of the city that night, and that it was burned in two where the west wire of the light company passed over the arc light line of the city. That the down wires of city were thrown up in trees that night, one end in a tree just west and one in a tree just east.

Tennie McCowan testified for plaintiff substantially as follows: That he went to the fire at Mr. Hynd's, and in coming back he passed H. Q. Smith's house. That the light company had a transformer pole across the street in front of Mr. Smith's house. That Mr. Smith's house wires left the light company's line at the transformer pole and went right across the street into Mr. Smith's house across the line of the city. That his attention was attracted to a down wire in the street flashing, and that he got off the wagon and got a stick and wrapped one end of the wire around stick and tied it to a pole so they could drive the wagons under it. That across the street the wire was attached to a transformer pole of the light company, and that, after he got up on the porch, he took hold of the wire with his hand, being on wood, which was a nonconductor, and tied it around pole (porch column). That there was only one of Mr. Smith's service wires down, and that was the one he tied up. That he did not see either of the city's wires burned in two. That he only saw the one wire down, and does not know whether that was burned in two, as he made no examination. That the wire spluttering in the street was the wire of the light company and was a live wire. That, when he took a stick and car-

ried it over the fence and upon the porch and reached up and tied it on the column of the front porch, the other end at that time was attached to the pole across the street. That he did not see any other wire or line sparking there. That the line was dead after he got it upon the pole (porch column). That it was not burned between transformer and Smith's house. If it had been he could not have gotten it back to house. If it had been burned in two at the curb there would not have been enough wire to have taken it back to Mr. Smith's gallery. That he never touched the end of wire coming out of house. That the wire was out in street also attached to the pole, and he brought it across street and took it there to Harry Smith's porch. That this wire did not come from Mr. Smith's house, but was a wire that came from the pole across the street. That he could not be mistaken because he got the wire out in the middle of the street. After McCowan had carried the down wire across the street and attached same to the porch column of Mr. Smith's house, Tom Chambliss, driver of the fire wagon, drove under the wire.

Walter Wilson, a witness for the light company, testified on cross-examination of city:

That he was lineman for the light company, and it was his duty to look after the stretching of wires. That he said they had made no other repairs than putting up the line (Mr. Smith's service wires). That they had one wire up there in the house and they took that wire down and put in a new wire. "I was up there that night, and I cut down the wire from the pole—the west wire from the pole—and let it fall in the street, and let it lay there, and did not do anything else until the next morning. I cut the wire just after the fire that night. When I got there the next morning the wire was lying in the same place. The other end was wrapped around a post and tied. The night before I saw that wire, the wire was clear, saw the other end burned loose and wrapped around the post, and I cut the wire at the post and just let it fall, and did not pull it out of the street. The end of the wire that fell to the ground near the post, it was dark, and I could not see, and I just let it fall where it would. The next morning when I went around, the city people had been there doing some work, and I found the wire in the same position, except the other end of the wire that I cut was tied over there on the post. The burned end was tied over there at Smith's house around the porch post. With reference to the other end of wire coming out of the gable of Mr. Smith's house, I actually saw it there that morning. I am not guessing about it; saw it coming out of the gable. The other end was attached to the gable end of the house, and was hanging down on porch."

The light company introduced testimony showing that the arc line of the city was above Mr. Smith's house wires before fire. On behalf of the city it was shown that the arc line of city before the fire was beneath Mr. Smith's house wires. The undisputed testimony was the next morning after the fire the city lineman spliced up the arc wire, and then light company's lineman put up two new service wires at Mr. Smith's house in lieu of the down wire and the one remaining

up, and, after the lines were repaired, the service wires of the company were about two or three feet above the arc wire of the city, and continued so until the day of trial. The city linemen, Wilson and Ware, testified to facts with reference to change of a position of a bracket in a tree to which the arc wire was attached, tending to show that the city wire may have been lowered, but the city lineman denies making any change. The issue as to whose line was above the other was a hotly contested one, and the record is a very large one, and it is not deemed necessary to set out all the evidence on this issue.

Mrs. Benge Quesenberry testified for the light company substantially as follows: That she remembered the occasion of the fire at Mr. Hynds'. That she was out on her east porch, and that she saw a flash up in a cottonwood tree in front of Mr. Smith's house. That an electric light wire ran through the tree. That it would flash up an instant and go out, and then flash up again. That she had never seen sparking in that tree before. That she and her husband stayed out on the porch until they heard them calling over at Mrs. Hynds', sat there and watched the blaze in the tree until they heard them calling. It would arc up and blaze, and then would kind of spread out and vanish.

Mrs. William Hynds testified substantially as follows: That she remembered the occasion of the fire at her house. That night just before the fire she noticed a sparking in a tree in front of Mr. Smith's house. The limb of the tree came to where Mr. Smith's house (wire) came to, and the tree was in about 15 feet of the wire. That it was just after dusk. That what happened to her lights that night was that the kitchen caught on fire from the lights. That her son cut the wires, and this cut off the light from the kitchen, but this did not shut off the lights from the rest of the house. That there was nothing affected but the kitchen light, and when he cut the wires it stopped the burning. That her son was an electrician.

Mrs. H. Q. Smith, witness for light company, testified substantially as follows: That she lived at McKinney and remembered the occasion of the fire at Mrs. Hynds'. That just prior to the fire she was on her porch and noticed a blaze in a tree. That the flashing in the tree was the only flashing or arcing she noticed. That the tree was east of her house wire some 15 or 20 feet. That her lights were kind of flickering when she saw the blaze in her tree. That the flashing impressed her at the time as being near the center of the tree. That she did not know whether the wires were crossed or not, and did not know whether her house wires helped to cause the sparking or not. That after the fire at Mrs. Hynds' they did not have any lights that night. That the next day her globes were all right, and when the man fixed the wires the lights went on burning just

the same. That she could not remember just exactly when her lights went out, but thinks they were kind of flickering when she went up to Mrs. Hynds'.

It was shown by the testimony of plaintiff that on the evening in question he went to turn off his electric light in bathroom in the usual and customary manner, and he received a shock which held his hand to the socket for a time, and that, in trying to get loose, his thigh came in contact with a metal lavatory connected to the ground with pipes, and he was burned in hand, on thigh, and was knocked unconscious.

Mrs. Montgomery, wife of the plaintiff, testified: That the first thing that attracted her attention was a flash of light that seemed to fill the bathroom. That she jumped up immediately and ran into the bedroom, which was between her and the bathroom, but before she got into the bedroom she heard Mr. Montgomery fall. She placed her baby on the bed and went into the bathroom and dropped down beside her husband and saw he was growing unconscious, and she got up and immediately gave the alarm.

Sol Weisman testified: That he lived across the street from where plaintiff used to live, and remembered the occasion when plaintiff got injured on his house light. That prior to that he heard something that called his attention to there being a fire. That he has a faint recollection that the alarm was growing closer, and that he thought he heard the bell and fire wagon. That when he heard the alarm he searched around to find the fire. That from where he was he could not see Mr. Smith's house and did not look in that direction, and nothing attracted his attention in that direction, but there was a sparking in the neighborhood east or northeast. After the sparking that he had been looking at, he heard Mrs. Montgomery call for help. That it was a minute or two, perhaps longer, after he heard the sound of the gong, before he heard Mrs. Montgomery call for help.

The plaintiff lived across the street immediately south of Mr. Weisman, and Mr. Smith's house was north of Mr. Weisman on another street (Tucker street), and Mrs. Hynds' house was west of Mr. Smith on Tucker street.

[8] By the foregoing it is seen that the engineer of the city electric plant declares positively that he had not turned the electric current on the city's wires the night appellee was injured, and he is strongly corroborated in that respect by the city marshal and the fireman who accompanied the department to a fire at the residence of Mr. Hynds, which is on Tucker street, just beyond the point where the city's wires and those of the light company crossed. It is also important at this point to remember that appellee was injured about the time the department was called to Hynds' house. In fact, the witness Weisman, who lived across the street from appellee,

was listening to the fire bells and trying to locate the fire when he heard appellee's wife's call for help, and when she called for help was but a short space after appellee fell unconscious from the shock he received. The only evidence that conflicts with that of the engineer and the city marshal and the fireman is that of the witness Scott, who stated that, while on his way home, he heard the fire alarm, just prior to which he noticed one of the city's arc lights come on, and, after burning for a minute or a half minute, flickered and went out; but he frankly admits that the lights were not burning prior to the sounding of the fire alarm, and that they only burned in the manner and to the extent he detailed. In explanation of what Mr. Scott saw, it was shown that if the city's wires were without current and should come in contact with live wires of the light company, such live wires would cause the arc lights to burn as detailed by Scott, until the arc wires parted and fell to the ground. The arc wires were burned apart. Nor was any other witness introduced in contradiction of the city's witnesses to show that the arc lights in fact were burning. The testimony which we have quoted discloses other facts and circumstances tending to corroborate the salient points we have mentioned, but none that seriously tend to contradict them. Such being the state of the evidence, we conclude that it raises at most but a "mere surmise or suspicion" that the city's current was on its wires at the time appellee was injured. It was said in Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059, that, where the testimony warranted no more than surmise or suspicion, the jury was not authorized to infer therefrom a fact necessary to a given issue. When such condition is disclosed by the record, it is our duty "to render such judgment or decree as the court below should have rendered," etc.; and, however reluctant we may be to disturb the verdict of the jury, it is made our duty to do so in such cases as is presented by the record in this appeal.

Accordingly, there being evidence to support the verdict against appellant light company, the judgment of the district court, as between appellee and appellant light company, is affirmed, and, as between appellant city of McKinney and all others, the judgment is reversed, and here rendered for appellant city of McKinney.